**IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND**

| | | | |
|---|---|---|---|
| **UNITED STATES** | : | | |
| | : | | |
| | : | | |
| **v.** | : | **Case Nos.** | **JKB-24-0003** |
| | : | | **JKB-14-0343** |
| **ANTOINE TURNER** | : | | |
| | : | | |
| **Defendant** | : | | |

**MEMORANDUM IN ADVANCE OF SENTENCING**

Antoine Turner, the Defendant, by and through Andrew R. Szekely, Supervisory Assistant Federal Public Defender, files the following memorandum to aid the Court at his January 7, 2026, sentencing hearing. At the hearing, the Court should impose a sentence of time-served from September 5, 2023, through September 22, 2023, in the 2024 case to be followed by a 3-year term of supervised release. In the 2014 case, Mr. Turner requests that the Court revoke and terminate his supervised release and impose a concurrent sentence with the new case. Mr. Turner further asks the Court to impose the maximum supervised release term of 3 years and to keep Mr. Turner on the same stringent conditions he has complied with since September 22, 2023, including home detention and location monitoring. A sentence that favors high-intensity community supervision in lieu of incarceration is the sentence which is "sufficient, but not greater than necessary" for Mr. Turner.

**PROCEDURAL HISTORY, THE PRESENTENCE REPORT, AND SENTENCING
GUIDELINES RANGE**

Mr. Turner appeared before the Court on August 7, 2025, and pleaded guilty, in the 2024 case, to one count of Possession with Intent to Distribute Cocaine, in violation of 21 U.S.C. § 841. Mr. Turner entered his plea without an agreement with the government. *See* Plea Letter, ECF No. 43. At the same proceeding, Mr. Turner also admitted that his guilty plea constituted a violation of his supervised release in the 2014 case.

1

The Presentence Report (PSR) calculated the total drug weight in the offense as 4.6 grams. PSR at ¶ 9. All cocaine offenses involving under 50 grams result in a base offense level of 12. PSR at ¶ 14. Because Mr. Turner has prior controlled substance offenses, as defined in U.S.S.G. § 4B1.2(b), in his criminal history the offense level is raised to 32 due to the application of the career offender guideline. PSR at ¶ 20, U.S.S.G. § 4B1.1. With a 3-level reduction for Mr. Turner's acceptance of responsibility, his total offense level is 29. PSR at ¶ 23.

The Presentence Report found a total of 10 criminal history points. PSR at ¶ 34. Because Mr. Turner was on supervision at the time of the 2024 offense, he receives an additional criminal history point. PSR at ¶ 35. Mr. Turner, absent the career offender guideline, would be in criminal history category V. PSR at ¶ 36. The application of that guideline increases Mr. Turner's criminal history category to VI. Mr. Turner's career offender guideline range is therefore 151 to 188 months' incarceration. PSR at ¶ 97. Mr. Turner does not object to the PSR's guideline range calculation.

Mr. Turner's conviction in the 2024 case constitutes a Grade A violation of his supervised release in the 2014 case. Mr. Turner's advisory sentencing guidelines range for the violation case is the statutory maximum 24 months' incarceration. U.S.S.G. §§ 7C1.1; 7C1.5.

A sentence within the guidelines range, however, would be unreasonable.

## ARGUMENT

**I. The federal sentencing framework invites the Court to look past the sentencing guidelines.**

Even before the sea change *United States v. Booker*, 543 U.S. 220 (2005), brought to federal sentencing practice, the Supreme Court recognized that sentencing is an individualized process and that "every case [is] a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). Over the past two decades, a line of Supreme Court cases has steadily eroded the

importance of the guidelines by first declaring the guidelines to no longer be mandatory; then stripping the guidelines of the presumption that they yield a reasonable sentence; and finally by emphasizing 18 U.S.C. § 3553(a)'s overarching directive that a sentence be "sufficient, but not greater than necessary" to accomplish the statutory aims of sentencing. *See Booker, supra*; *Gall v. United States*, 552 U.S. 38, 49-50 (2007); *Kimbrough v. United States*, 552 U.S. 85 (2007).

In other words, the Court is free to vary from the once non-negotiable parameters of the United States Sentencing Guidelines (hereinafter the "Guidelines"), including the career offender enhancement. *See Gall*, 552 U.S. at 49. Of course, judges must consider the advisory guideline range in crafting a sentence. However, "[the Judge] may not presume that the Guidelines range is reasonable. . . [and] must make an individualized assessment based on the facts presented." *Id.* at the 49-50 (*citing Rita v. United States*, 551 U.S. 338, 351 (2007)); *see also United States v. Raby*, 575 F.3d 376, 380 (4th Cir. 2009) ("The Sentencing Guidelines are advisory, and sentencing courts have discretion to sentence defendants within the statutory range, regardless of whether the sentence falls within the Guidelines range or without.").

Thus, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all the sentencing factors outlined in 18 U.S.C. § 3553(a) to determine whether they support the sentence requested by each party. In the end, a sentencing court must never disregard the legislative mandate that "[18 U.S.C. § 3553] . . . contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." *Kimbrough*, 552 U.S. at 85.

II.     **The Court should not follow the advice of the career offender guideline.**

Section 4B1.1 of the Guidelines specifies the criteria for determining whether a defendant is subject to its draconian career offender enhancement, and the sentencing implications when a

3

defendant meets the criteria. This adjustment is neither mandatory nor binding; therefore, the Court has the discretion to reject it by imposing a lower sentence. Indeed, district courts "may vary from the Guideline ranges based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough*, 552 U.S. at 101; *see also United States v. Spears*, 555 U.S. 261, 264-66 (2009) (stating that district courts can vary from the advisory guidelines ". . . based on policy disagreements with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case"). Here, the Court should reject the career offender guideline for several reasons.

*First*, Mr. Turner is not the sort of defendant the drafters of the career offender guidelines had in mind when they promulgated the guideline. Congress's goal in issuing this directive was not to punish all "repeat drug traffickers, but rather a specific type of repeat offender who posed the most danger to society and was responsible for distributing large amounts of illegal drugs." See S. Rep. No. 98-225 (1983).

Specifically, Congress wanted long, near maximum sentences for repeat drug offenders:

1. for whom drug trafficking was "extremely lucrative";
2. who distributed drugs to "an unusual degree" through "continuing patterns of criminal activity";
3. who have "substantial ties outside of the United States from whence most dangerous drugs are imported into the country"; and
4. who have the resources and contacts to "to escape to other countries with relative ease in order to avoid prosecution . . . ."

*Id.* at 20, 212.

In other words, Congress wanted to target kingpins and major drug traffickers -- the repeat drug trafficking offenders, who by the nature of their continuous criminal conduct, were at or near the top of the drug trafficking chain, and benefitted from the money, resources, and foreign contacts not available to lower-level drug offenders.

4

Mr. Turner meets none of these criteria. He has not made large amounts of money from his drug sales. His prior convictions involved, like this offense, street-level distribution quantities of drugs. And, he neither imported drugs nor has any ties outside the country. Indeed, Mr. Turner is the exact opposite of the defendants Congress believed were the most dangerous drug dealers selling the highest amounts of drugs; unlike Mr. Turner who possessed under 5 grams of cocaine during his offense conduct.

The Court, however, need not just rely on Mr. Turner's arguments regarding the career offender guideline. The Sentencing Commission has urged Congress to revise § 994(h) in a fashion that would remove Mr. Turner from those defendants subject to the career offender guideline.

In 2016, the Sentencing Commission issued a report to Congress regarding the career offender guideline. *See* U.S.S.C., Report to Congress: Career Offender Sentencing Enhancements (July 2016) . The report was the result of a "multi-year study of statutory and guideline definitions related to the nature of a defendant's prior conviction and the impact of such definitions on the relevant statutory and guideline provisions." *Id.* at 2. The report covered a broad swath of issues related to the career offender guideline. Relevant to Mr. Turner's case, were its findings and recommendations related to individuals whose career offender predicate offenses were controlled substance offenses as opposed to those who had crimes of violence in their past.

The Commission "conclude[ed] that drug trafficking only career offenders are not meaningfully different than other federal drug trafficking offenders and therefore do not warrant the significant increases in penalties provided for under the career offender guideline." *Id.* at 27. The differences between defendants with prior conviction for crimes of violence and those without are so stark that the Commission found that drug-only career offenders are more likely

5

to receive below-guideline sentences for reasons other than substantial assistance. *Id.* at 35-37. Further, the extent to which these sentences were below the bottom of the guideline range was also largest for drug-only career offenders. *Id.* at 34. Indeed, the report found that the sentences imposed for drug-only career offenders to be virtually identical to their non-career offender guidelines. *Id.* at 44. In Mr. Turner's case, his non-career offender guideline range would be 21 to 27 months' incarceration.[1]

As a result of this analysis, the Commission has asked Congress to amend § 994(h) to only have the career offender guideline apply to individuals who have at least one prior crime of violence as one of their career offender predicates. *Id.* at 45. In other words, should Congress follow the Sentencing Commission's recommendation, Mr. Turner would not be a career offender. To date, Congress has not acted on this recommendation.

Nonetheless, the Sentencing Commission's acknowledgement that the career offender guideline is not appropriate in cases such as this is the exact type of policy argument that this Court can rely upon in imposing a non-career offender sentence. *See Kimbrough v. United States*, 552 U.S. 85, 101 (2007); *see also United States v. Spears*, 555 U.S. 261, 264-66 (2009) (stating that district courts can vary from the advisory guidelines ". . . based on policy disagreements with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case").

### III. The § 3553(a) factors support intense supervision, not a sentence of incarceration.

Section 3553 of Title 18 of the United States Codes lists several factors for the Court to consider during sentencing. The statute, however, gives no guidance as to how to weigh each factor. Rather, the consideration of each factor and determining which factors are most important

---

[1] The non-career offender guideline range is based on a post-acceptance total offense level of 10 and a criminal history category of V.

in a case is the heart of the individualized sentencing process. In this case, despite the seriousness of the offense and Mr. Turner's criminal history, the sentencing factors focusing on public safety and Mr. Turner's history and characteristics, as they are today, support a time-served sentence.

Mr. Turner's conduct since his release in 2023 "provides the most up-to-date picture" of his "history and characteristics." *Id.* at 492 (citing *United States v. Bryson*, 229 F.3d 425, 426 (C.A.2 2000) (per curiam) ("[A] court's duty is always to sentence the defendant as he stands before the court on the day of sentencing")). In the context of a resentencing, the Supreme Court held "exemplary postsentencing conduct may be taken as the most accurate indicator of [a defendant's] present purposes and tendencies and significantly to suggest the period of restraint and the kind of discipline that ought to be imposed upon him." *Pepper v. United States*, 562 U.S. 476, 492-93 (quoting *Pennsylvania ex rel. Sullivan v. Ashe*, 302 U.S. 51, 55 (1937)). The same logic applies at an initial sentencing.

On September 22, 2023, Mr. Turner was released on pretrial release and placed on home detention, which included permission for Mr. Turner to continue to work. *See* Release Order, JKB-14-0353 ECF No. 60. A week later, then-Magistrate Judge Brendan A. Hurson modified Mr. Turner's release order to permit him to get regular haircuts, a requirement of his manager position at Royal Farms. *See* Modification Order, JKB-14-0353, ECF No. 64. When Mr. Turner made his initial appearance in the 2024 case he remained on pretrial release, on the same conditions as in the 2014 case. *See* Release Order, JKB-24-0003 ECF No. 7.

For the past two years and three months, Mr. Turner has been remotely monitored, with all his comings and goings tracked by GPS. During these many months, Mr. Turner has led law-abiding and productive life. Mr. Turner, who has worked at Royal Farms since 2022, was promoted earlier this year to be the overnight shift leader for the Royal Farms located on Fleet Sleet in Fells Point. Royal Farms Employee Records, Exhibit A; PSR at ¶ 86.

In his time at Royal Farms, Mr. Turner has sought out and obtained a range of professional trainings ranging from Americans with Disabilities Act compliance to deescalation techniques. The latter training has been very helpful to Mr. Turner as he has transitioned into a management role at Royal Farms. He explained to counsel that because Royal Farms is one of the only locations in Fells Point that never closes, the location previously had problems with drunk and disorderly customers. Since Mr. Turner started to work nights, however, his no-nonsense manner when dealing with unruly patrons has made his store a calmer, safer place.

Mr. Turner is a jack-of-all-trades at the Royal Farms. In one shift he will go from starting the fryer to make Royal Farms' fried chicken to restocking shelves to overseeing other associates during his shift. Mr. Turner reports that his supervisors have told him he is a strong candidate for further advancement, but Mr. Turner has been reluctant to take on additional responsibilities at work given the uncertainty related to his sentencing.

Mr. Turner's long-term goal is to take the skills he has learned at Royal Farms, combine them with his love of cooking for others, and open a food truck. Mr. Turner plans to enroll in a ServSafe food safety certification program.[2] Food safety certification is an important first step in obtaining a food truck license in Baltimore.

When Mr. Turner is not at work, or running personal errands on his usual day off of Friday, he is with his family. In 2020, Mr. Turner began a romantic relationship with Shalisa Cassell. He and Ms. Cassell have known each other since they were teenagers, but only began dating in their 40s. The PSR notes Ms. Cassell has had serious health challenges, during which time Mr. Turner cared for Ms. Cassell and assisted with her treatment. PSR at ¶ 67.

---

[2] ServSafe is a food safety certification program administered by the National Restaurant Association.

8

Mr. Turner is also a crucial part of his mother Barbara Gilbert's support network. Ms. Gilbert is in long-term, outpatient mental health treatment. Letter from UMMC Carruthers Clinic, Exhibit B (under seal). Due to the severity of her illness, Mr. Turner handles many of his mother's matters via his designation as her agent in a power of attorney. Mr. Turner's assistance with his mother's finances and helping her stay on top of her treatment is an important component of her ability to continue to live independently in the community.

Mr. Turner's relationship with his daughter Aijee Morris is one of which he is very proud. Although he was in and out of prison through her childhood, Mr. Turner successfully built a strong relationship with Ms. Morris in adulthood. Among Mr. Turner's happiest moments in the past years have been the birth of his two grandchildren and the many family events he has been able to attend.

Mr. Turner's priorities are the right ones – work and family. In the fall of 2023, Mr. Turner was hanging out on the street, not with his family. His employment records show he was working just 19 hours per week during that time. Exhibit A. Now, he works 40 nightshift hours per week at a hard, unglamourous job; sleeps much of the day; and spends his free time with his loved ones. Mr. Turner's over two years of full-time work with a promotion, and chances for more, shows Mr. Turner's commitment to maintaining a productive, meaningful life.

Mr. Turner's positive life circumstances are not only accomplishments for which he is justifiably proud; rather, they relate to the 18 U.S.C. § 3553(a) factors the Court must evaluate before imposing sentence.

Mr. Turner poses no ongoing danger to public safety. For 27 months, Mr. Turner has complied with all the conditions of pretrial release – conditions that would be nearly identical to the supervised release conditions detailed in the PSR.

Mr. Turner's past record of supervision shows that during periods of intense supervision with strict rules he has done well. Mr. Turner's failures on supervision have all come with the loosening of conditions. Mr. Turner asks the Court maintain the same high level of supervision as part of his supervised release term. Mr. Turner will use that time to continue to build on his past two years of success in the community.

The government's memorandum asks the Court to speculate as to what unknown harms Mr. Turner's conduct may have caused because "there is no way to know what quantity of drugs previously ended up being sold and consumed or used by others, and of any overdoes that may have occurred." Gov. Memo. at 4. The government argues that these unknown, and unlikely harms, elevate Mr. Turner's offense into a "violent" one.[3] *Id.* Such speculation is not a proper basis for fact-finding at sentencing, and the Court should therefore reject the government's arguments.

Mr. Turner recognizes his offense is serious. But the offense should be placed in the appropriate context of what Mr. Turner's conduct was. The Sentencing Guidelines use drug weight as a measure of culpability. *See* U.S.S.G. § 2D1.1. While imperfect, especially in the case of mules or couriers, it offers rough approximation of culpability because the harms from drugs are magnified based on the quantity of the drugs. In Mr. Turner's case, his conduct falls in the least culpable category of cocaine distribution conduct – selling a small quantity of cocaine without possessing a weapon. The government's 108-month sentencing recommendation is incongruous with Mr. Turner's offense conduct and his long-term success since 2023.

---

[3] In 2023, the last year for which full data is available, 2,511 Marylanders died from drug overdoses. Of those, 87% died after overdosing on an opiate, most frequently fentanyl. 2023 Maryland Dep't of Health, Unintentional Drug and Alcohol-Related Intoxication Deaths, https://health.maryland.gov/vsa/Documents/Overdose/2023_IntoxAnnualReport_Final.pdf (last visited December 30, 2025).

Further incarceration is also not needed to specifically deter Mr. Turner from further offenses. His successes over the past year, and his fear of losing his progress, is sufficient to deter Mr. Turner from further offenses.

Likewise, not re-incarcerating Mr. Turner would advance respect for the law. Respect for the law is promoted when community members see the laws being applied and enforced in an even-handed way that accounts for the struggles and successes of those who are charged with crimes; in other words when the legal system recognizes and responds to people's experiences. Imposing unduly harsh sentences can send the message that individuals who offend and then rehabilitate themselves nevertheless are not welcome or viewed as valued members of their community. Such a message has the opposite effect of inadvertently diminishing respect for the law if people feel it is unresponsive to reality of how disruptive, and potentially derailing, re-incarcerating someone who has created a stable platform on which to rebuild a law-abiding life. In other words, disproportionally harsh sentences, which may create fear of the law, are as counter to the promotion of respect of the law as disproportionally lenient sentences.

As to general deterrence, the government argues that a variant sentence would "not send an appropriate message to other potential offenders." Gov. Memo. at 8. It also argues "the sentence imposed here will send a message to other offenders as a measure of what is appropriate punishment given the facts of the case and a defendant who is similarly situated in history and characteristics." *Id.* The government's' arguments should not persuade the Court. Mr. Turner's case is, unfortunately, not unique or newsworthy. No message of deterrence will reach those the government seeks to deter. Further, the government's argument directly contradicts 18 U.S.C. § 3553(a)'s requirement to avoid "unwarranted disparities" because that subsection requires the Court to consider similar sentences in similar cases, while still focusing on the individualized nature of each sentencing.

11

## CONCLUSION

For these reasons, and those to be developed at the January 7, 2025, hearing, Mr. Turner asks the Court to impose a sentence of time-served from September 5, 2023, through September 22, 2023, in the 2024 case to be followed by a 3-year term of supervised release. In the 2014 case, Mr. Turner requests that the Court revoke and terminate his supervised release and impose a concurrent sentence with the new case. Mr. Turner asks the Court to impose the maximum supervised release term of 3 years and to keep Mr. Turner on the same stringent conditions he has complied with since September 22, 2023, including home detention and location monitoring.

Respectfully submitted,

James Wyda
Federal Public Defender
 for the District of Maryland



Andrew R. Szekely (#16407)
Assistant Federal Public Defender
100 South Charles Street
Tower II, 9th Floor
Baltimore, Maryland 21201
Phone: (410) 962-3962
Fax: (410) 962-3976
Email: andrew_szekely@fd.org